UNITED STATES of America, Appellee,

v.

Harvey I. GLICK, Defendant–Appellant.

No. 1024, Docket 97–1118.

United States Court of Appeals,
Second Circuit.

Argued Feb. 13, 1998.

Decided April 14, 1998.

Marc Fernich, Burstein & Fass, LLP, New York City for Defendant–Appellant.

Paul Radvany, Special Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brian D. Coad, Special Assistant United States Attorney, Brooklyn, NY, on the brief), for Plaintiff–Appellee.

Before: JACOBS, LEVAL, and LAY,[*] Circuit Judges.

LAY, Circuit Judge.

In July 1988, William Loeb established an entity called Consolidated Local Union 867 (the "Union") in order to offer Blue Cross health insurance (the "Health Plan") to the general public. Shortly thereafter, Loeb also established the Consolidated Welfare Fund (the "Welfare Fund"), which qualified as an employee welfare benefit plan under ERISA. To obtain the Welfare Fund's health insurance coverage, an individual had to pay union dues and fees in addition to paying Welfare Fund contributions. The record reflects no other function of the Union or Union membership other than as a vehicle for enrolling in the Health Plan. As president of the Union and trustee of the Welfare Fund, Loeb exercised management control over the Welfare Fund's monies, bank accounts and assets and determined who would be admitted to the Union.

To expand the Union's membership, Loeb engaged insurance brokers and subbrokers to sell the Welfare Fund's health insurance program nationwide. As part of that effort, Loeb entered into an agency agreement with Harvey I. Glick and his insurance brokerage firm, HIG Associates, Inc. ("HIG").

[*] Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Under the agreement, Loeb gave HIG the exclusive right to market the Health Plan in eight states, and non-exclusive marketing rights in the remaining states.[1] Loeb required HIG to remit a certain amount of money to the Union and to the Welfare Fund for each Health Plan participant. HIG would keep any additional amounts it collected from the participants as its commission. HIG's responsibilities consisted of enrolling new employer groups into the Health Plan and handling the administrative aspects of the paperwork and billing. HIG also coordinated the sending of payments to the Union and to the Welfare Fund on a monthly basis and tracked any additions or deletions of memberships in the Union.

In the fall of 1989, HIG engaged Diversified Health Concepts, Inc. ("DHC") to market the Health Plan nationwide. Under the subbrokerage arrangement, DHC collected monthly premiums from the Health Plan participants, deducted a percentage from the premiums for its commission, and then forwarded the balance to HIG. HIG would then deduct its own commission from the premium payments and forward the balance to the Union and the Welfare Fund. Glick had the discretion to determine the amount of HIG's commission.

By 1990, the marketing efforts of HIG and DHC produced rapidly increasing enrollment in the Health Plan. In late 1989, it appears that Loeb asked Glick to pay him $5.00 for each participant enrolled in the Health Plan through DHC's marketing effort and, in return, Loeb would allow Glick to continue using DHC as a subbroker. Glick agreed to this proposal and accordingly made monthly payments, totaling approximately $150,000, to Loeb and his wife.

Testimony produced at trial showed that in June 1990, Glick complained to Robert Schneider, a principal of DHC, that he considered the payments to Loeb as "an expense of his business." Glick also told Schneider that paying Loeb by check allowed Glick to "control" Loeb and that Glick "felt that he had been very smart in making the payments by check because that way he could prove— that way Mr. Loeb could not deny the payments had been made." (A at 265).[2]

As a result of these illegal payments, Glick earned approximately $1.011 million in commissions from the sales of health policies by DHC between October 1989 and July 1990. The Welfare Fund eventually became insolvent and approximately $10 million in medical claims were left unpaid. Shortly thereafter, the government charged Glick with bribing a trustee of a welfare benefits plan, in violation of 18 U.S.C. § 1954 and with conspiracy to violate § 1954, in violation of 18 U.S.C. § 371.

After a three-day trial, a jury returned a verdict of guilty on all counts. The district court sentenced Glick to 46–months' imprisonment and a fine of $100,000 to be paid in monthly installments of $1,000. On this appeal, Glick raises several challenges to his conviction, sentence and fine.

## Discussion

### I. Merit of Conviction

■ Glick argues that the indictment against him failed to charge him with a crime because his conduct fell beyond the scope of 18 U.S.C. § 1954. We note that Glick failed to preserve this issue for appeal. However, we review this issue under the plain-error doctrine because it asserts a jurisdictional defect.[3]

---

1. The agreement also gave Loeb the right to terminate the agreement upon thirty days notice to HIG, and authorized HIG to appoint subbrokers to market the Health Plan.

2. Loeb pled guilty to one count of embezzlement from the Union, and one count of embezzlement from the Welfare Fund. He was sentenced to 71 months' imprisonment, three years' supervised release and required to pay restitution in the amount of $494,482. This Court affirmed his sentence on appeal. *See United States v. Loeb,* 45 F.3d 719 (2d Cir.1995).

3. This Court has previously recognized that an indictment's failure to charge an offense constitutes a jurisdictional defect subject to appellate review under the plain-error doctrine when the defendant did not preserve the issue for appeal. *United States v. Foley,* 73 F.3d 484, 488 (2d Cir.1996), *rev'd on other grounds Salinas v. United States,* —— U.S. ——, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997).

■ Section 1954 punishes "any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value" to a trustee of an employee welfare benefit plan "because of or with intent to ... influence[d] ... any of [the trustee's] actions, decisions, or other duties relating to any question or matter concerning such plan...." 18 U.S.C. § 1954 (1994). Glick concedes that his conduct falls within the literal sweep of the statute's language. He argues, however, that the statute should be interpreted to apply only when the illegal payments have a demonstrable connection with or effect upon plan assets.[4] In effect, Glick urges this Court to look beyond the plain language of the statute and impose an additional element to the crime of bribing a trustee. For the following reasons, we decline to do so.

■ We read the statute according to its plain meaning. "No rule of construction ... requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope...." *United States v. Raynor,* 302 U.S. 540, 552, 58 S.Ct. 353, 359, 82 L.Ed. 413 (1938). "A statute can be unambiguous without addressing every interpretative theory offered by a party. It need only be 'plain to anyone reading the Act' that the statute encompasses the conduct at issue." *Salinas,* —— U.S. at ——, 118 S.Ct. at 475 (1997) (*quoting Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991)).

In this case, Glick's conduct falls squarely within the literal scope of § 1954. Glick made illegal payments to the trustee of the Welfare Fund, in return for the exclusive right to market the Welfare Fund's health insurance program and to retain DHC as its subbroker. The statute criminalizes any payment made to a trustee of a welfare benefits plan intended to influence *any* of the trustee's decisions relating to *any* matter concerning the plan. In this context, the word "any" has an expansive meaning, *see United States v. Gonzales,* 520 U.S. 1, ——, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997), and encompasses Loeb's decision regarding who to retain as the Welfare Fund's insurance broker. We find there is no express language in § 1954 that requires the illegal payments to be connected with or to have an effect upon plan assets specifically.

■ Glick asserts the legislative history of § 1954 indicates Congress intended § 1954 to apply only when fund assets are affected by a bribe or kickback. We disagree. "Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language." *United States v. Albertini,* 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985) (citations omitted) (*quoting Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984)). By enacting § 1954, Congress intended to protect welfare funds from all conflict-of-interest payments, as well as to prevent kickbacks and bribes. *See United States v. Romano,* 684 F.2d 1057, 1063–64 (2d Cir.1982) (*citing* H.R.Rep. No. 998, 87th Cong. 1st Sess. 7, *reprinted in* 1962 U.S.Code Cong. & Ad. News 1532). We conclude there is no "extraordinary showing of contrary intentions" in the legislative history of § 1954 that warrants our adoption of Glick's proposed statutory interpretation.

## II. *Sentencing*

■ Glick raises three challenges to the district court's calculation of his sentence. Glick contends the district court erroneously

---

4. The Supreme Court recently rejected a similar argument made in connection with 18 U.S.C. § 666. *See Salinas,* —— U.S. at ——, 118 S.Ct. at 474–75. Section 666 criminalizes any payment to a state official to influence *"any* business, transaction or series of transactions of such ... [state] agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B) (1994) (emphasis added). In *Salinas,* the defendant urged the Court to interpret § 666 to require the illegal payment to affect federal funds. The Supreme Court held that, "[t]he enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)." —— U.S. at ——, 118 S.Ct. at 473. The Court also noted that Congress' use of "any" in § 666 "undercuts the attempt to impose this narrowing construction." *Id.*

found that: (1) Glick had paid a "bribe," with a base offense level of ten, rather than a "gratuity," with a base offense level of six; (2) the value of the "improper benefit" to Glick was the amount of HIG's commissions, rather than the total amount of the bribes Glick paid to Loeb; and (3) Glick was a "fiduciary of a benefit plan" warranting a two-level enhancement. We review *de novo* the district court's interpretation of the Sentencing Guidelines, and review the district court's factual findings for clear error. *United States v. Lopreato*, 83 F.3d 571, 574 (2d Cir.1996) (*citing United States v. Reese*, 33 F.3d 166, 174 (2d Cir.1994)).

### A. Measurement of "Improper Benefit"

■ The district court found that Glick had collected $1.011 million in commissions from DHC's sales of the Health Plans. The district court used this figure to impose an eleven-level increase to Glick's base offense level sentence pursuant to U.S.S.G. §§ 2E5.1(b)(2) and 2F1.1's loss table for receipt of an "improper benefit."[5] Glick contends the district court used the wrong measure of "improper benefit" under § 2E5.1(b)(2) and that, as a matter of law, Glick could not have received any "improper benefit." We note that Glick failed to preserve these arguments for appellate review, and we therefore review this claim for plain error. *See United States v. Keppler*, 2 F.3d 21, 24 (2d Cir.1993).

■ Glick first argues the figure of $1.011 million constitutes his *gross* profits from DHC's Health Plan sales, and the district court erred by not deducting the amount of direct costs Glick incurred to derive the *net* value or benefit he actually received. Glick contends § 2E5.1(b)(2) requires a district court to use the amount of net value, not gross profit, as the amount of "improper benefit."

■ We agree that the appropriate measure of the "improper benefit" under § 2E5.1(b)(2) is the net value of the benefit received, rather than the gross income received. *See Lopreato*, 83 F.3d at 576. However, Glick has failed to establish direct costs sufficient to warrant a reduction of his sentence.[6]

■ According to Glick's post-argument affidavit, HIG's business costs included roughly $39,000 in moving and rental costs, $150,000 in office improvements and computer systems, and $215,000 in new employee salaries. These expenditures, however, consisted of indirect costs associated with HIG's general business. In calculating the amount of "improper benefit," only direct costs, not indirect costs, should be subtracted from the gross value received. *See United States v. Landers*, 68 F.3d 882, 885 (5th Cir.1995) ("[I]ndirect costs have no impact on the harm caused by the illegal conduct.... For both parties, the benefit of an additional contract is measured by gross revenue minus direct costs. By definition, indirect costs do not affect that value."); *United States v. Schweitzer*, 5 F.3d 44, 47 (3d Cir.1993) ("This concept of 'net value received' has nothing to do with the expense incurred by the wrong-doer in obtaining the net value received."). Therefore, these expenditures are not rele-

---

5. Section 2E5.1(b)(2) directs a district court to increase a defendant's offense level by the "number of levels from the table in § 2F1.1 (Fraud and Deceit) corresponding to the value of the prohibited payment or the value of the improper benefit to the payer, whichever is greater." Application Note 4 of § 2E5.1 refers to § 2C1.1 for the definition of "[v]alue of the improper benefit." Application Note 2 of § 2C1.1 states that the improper benefit is the net value of the benefit received. This Court has recognized that "[s]ection 2E5.1(b)(2) measures the harm caused by defendant's acts by measuring the benefit to the bribe-payer." *Lopreato*, 83 F.3d at 576.

6. This court provided Glick the opportunity to present evidence of his direct costs following oral argument on appeal. In response, Glick's attorney submitted to this Court an affidavit from Glick that outlined estimates of HIG's business expenditures from 1989 to 1990.

Glick characterized these expenditures as HIG's direct costs expended in marketing the Health Plans. The government correctly notes, however, that Glick failed to delineate any direct costs attributable specifically to the Health Plan business generated by DHC from costs associated with Health Plan business arising from other sources. The government also asserts there were two other businesses operating out of the same offices, and Glick's estimates fail to segregate costs associated with the other businesses from HIG's costs.

vant to the determination of the net value Glick received as a result of the bribes to Loeb.

The only remaining expenditures set forth in Glick's affidavit are $100,000 for subbrokers' commissions and $30,000 in Health Plan sales expenses. Glick concedes that the $100,000 in subbrokers' fees were paid to subbrokers other than DHC, and therefore cannot form direct costs associated with the commissions he made from DHC's sales. Assuming the $30,000 of expenses constitutes direct costs Glick incurred in connection with DHC's sales of the Plan, this figure is insufficient to warrant a sentence reduction under U.S.S.G. §§ 2E5.1(b)(2) and 2F1.1. To warrant a sentence reduction, Glick would need to prove direct costs in excess of $200,000 in order to decrease the loss calculation under § 2F1.1. Furthermore, Glick would not be entitled to a reduced sentence unless he could show he received less than $350,000 in improper benefit, meaning he incurred direct costs in excess of $650,000, in order for any alleged error in the calculation to affect the guideline range. Because there is no evidence suggesting Glick incurred more than $30,000 in direct costs, we conclude any error in calculation is harmless error. *See Keppler*, 2 F.3d at 24. We find that Glick's affidavit fails to establish direct costs sufficient to warrant a reduction under U.S.S.G. §§ 2E5.1(b)(2) and 2F1.1.

■ Glick also argues that as a matter of law he could not have received an improper benefit because he provided the Plan participants with valuable marketing services and legitimate health insurance. Thus, Glick argues, any benefit he received was in exchange for the legitimate services he provided the Plan participants. For support, Glick relies upon the Third Circuit's decision in *United States v. Schweitzer*, 5 F.3d 44 (3d Cir.1993).[7] There, the Third Circuit noted that the Guidelines "allow for a deduction of the value that would be derived in a legiti-

mate transaction not induced by a bribe.... Because the sale item had a value that any purchaser in a legitimate transaction would receive, that value was not received as a result of the bribe and should not be considered in determining the degree of the bribe giver's culpability." *Id.* at 47.[8] Assuming the Guidelines do allow for a deduction based upon value derived from a legitimate transaction, we find such a deduction is not appropriate in this case. Here, it is not possible to separate the value Glick received, i.e., the commissions on the DHC sales, from the illegal payments Glick made to Loeb. There was no aspect of Glick's transactions with the Plan participants that was legitimate. All of the commissions Glick received resulted directly from his bribery payments, which allowed HIG and DHC to continue as the exclusive marketing agents for the Plan. We therefore reject Glick's argument.

### B. *Bribe or Gratuity*

■ Glick challenges the district court's determination that he had paid a bribe to Loeb, rather than a gratuity. Glick argues the district court could not tell from the general verdict whether the jury had determined the payments constituted a gratuity or a bribe. Therefore, there was no support for the bribery enhancement. Glick also contends the district court's finding of bribery is erroneous. We disagree.

The record contains ample support for the district court's conclusion that Glick's payments to Loeb were bribes, not gratuities. Glick and Loeb agreed that if Glick paid Loeb $5.00 for each additional participant, then Loeb would continue to use HIG and DHC as his brokers. This arrangement comports with our definition of a bribe. *See United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 341, 342 (2d Cir.1961) ("Bribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyal-

---

7. In *Schweitzer*, the defendant argued the amount of the illegal payments he made to a government official should be deducted from the net benefit he received as a result of the bribery.

8. Glick also mistakenly relies upon the Third Circuit opinion in *United States v. Maurello*, 76

F.3d 1304 (3d Cir.1996). The *Maurello* decision is inapplicable to this case because it involved the assessment of loss caused by fraud, not bribery, and focused upon the amount of money taken from victims, not the amount of benefit derived as a result of a bribe.

ty."), *cited with approval in United States v. Rooney*, 37 F.3d 847, 852 (2d. Cir.1994). In addition, Glick told a business associate that his payments to Loeb were "an expense of business" and said the payments gave Glick "some control over Loeb." These statements are not consistent with the payment of a gratuity. We find there is ample support for the district court's finding that the payments constituted bribes, not gratuities.

### C. *"Fiduciary" Increase*

 The district court found Glick was a fiduciary of the Welfare Fund and accordingly assessed a two-level enhancement to Glick's sentence pursuant to U.S.S.G. § 2E5.1(b)(1). Glick contends that, as a matter of law, he cannot qualify as a fiduciary because he performed only mundane tasks that are routinely performed by salespersons, and lacked managerial control over the Welfare Fund assets. Glick has styled this issue as a question of law, but we review this kind of question under a more deferential standard. *See United States v. Leonard*, 37 F.3d 32, 38 (2d Cir.1994) (holding that where a defendant's "attack presents a view of the district court's findings that does not support a role enhancement, ... [t]he issue ... devolves into whether [the district court's] findings of fact were sufficient to warrant the role in the offense adjustment, which we review under the clearly erroneous standard.").

Application Note 3 to § 2E5.1 defines "fiduciary" by reference to the ERISA definition. 29 U.S.C. § 1002(21)(A) provides, in part:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting* management or *disposition of its assets* ....

29 U.S.C. § 1002(21)(A) (1994) (emphasis added). To determine whether Glick qualifies as a fiduciary under this definition requires a two-part inquiry. First, did the monies Glick collected from DHC, from which Glick took his commissions and passed the remainder of on to the Welfare Fund,

constitute assets of the Welfare Fund? Second, if the monies were Welfare Fund assets, did Glick have any authority or control over those assets?

Glick argues that the participants' contributions did not become assets of the Welfare Fund until after the contributions reached Loeb. We do not agree. It is more reasonable to conclude that the contributions became assets of the Welfare Fund as soon as the employees contributed them to their employers. We reached a similar conclusion in *United States v. LaBarbara*, 129 F.3d 81, 88 (2d Cir.1997). There, the defendant, convicted of aiding and abetting in the embezzlement of welfare fund assets, argued that moneys owed to ERISA benefit plans are not assets of such plans until banked. We rejected this argument, finding that an employer's obligation to contribute employee wages to an ERISA benefits plan constituted an asset of such plan. By the same logic, the monies an employer actually pays over to the welfare plan, directly or indirectly and regardless of whose control such monies passes, constitutes welfare plan assets from the time the employer parts with the monies. It is reasonable to conclude that the monies retain their character as fund assets as they pass downstream, through Glick, to the fund's bank account. We therefore conclude the welfare contributions made by the participants constituted assets of the Welfare Plan by the time Glick took possession of the contributions.

We next consider whether Glick had managerial discretion or control over the disposition of the Welfare Fund assets. In the past, we have broadly construed what it means to have actual control over the disposition of plan assets. *See Blatt v. Marshall and Lassman*, 812 F.2d 810, 813 (2d Cir.1987) (accounting firm officers exercised actual control over fund assets when they were able to prevent a payout to a beneficiary by failing to deliver a notice of change form reflecting the fact that the beneficiary had left the firm's employ). After reviewing the record, we conclude Glick had sufficient control over at least part of the Welfare Fund assets to create a fiduciary relationship. Glick had full discretion in selecting the amount of HIG's

commission to be collected from each participant. He had the authority to incorporate that amount of commission into the amount of fund contribution the participants would be required to make. When Glick received the participant's contributions from DHC, he deposited the funds into HIG's own bank account (not into a separate escrow) and issued checks from the account to the Welfare Fund. Finally, Glick deducted his commission directly from Welfare Fund assets (the participant's contributions). It is clear that Glick exercised fiduciary power with regard to those Welfare Fund assets he used to pay HIG's commissions. The extent of Glick's control over the Welfare Fund assets establishes he was a fiduciary of the Welfare Fund.[9]

■ It is important to note that the mere deduction of an agent's commission from welfare fund assets does not, in itself, create a fiduciary relationship between the agent and the fund. The fiduciary relationship in this case is created because the agent exercised unhampered discretion in setting the commission rate. Conversely, an agent with a contractually-established commission rate is not, without other indicia, a fiduciary to the plan. We have previously recognized the distinction between these two types of arrangements:

> When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him. Such a person is not an ERISA fiduciary with respect to the terms of the agreement for his compensation.... On the other hand, after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such con-

trol over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation.

*F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987); *see also Sixty–Five Security Plan v. Blue Cross & Blue Shield,* 583 F.Supp. 380, 387–88 (S.D.N.Y.1984) (finding Blue Cross to be a fiduciary with respect to its own compensation where its fees were based on a percentage of claims paid, and Blue Cross had complete discretion and control over what claims would be paid). Because Glick exercised fiduciary power over some of the Welfare Fund assets, we affirm the imposition of the two-level enhancement made pursuant to § 2E5.1(b)(1).

### III. *Imposition of the Fine*

■ Pursuant to U.S.S.G. § 5E1.2(a), the district court imposed a $100,000 fine upon Glick. On appeal, Glick raises two challenges to the fine. First, Glick argues the district court failed to consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572 in determining the amount of the fine. *See United States v. Stevens,* 985 F.2d 1175, 1188 (2d Cir.1993) (instructing the district court, on remand, to "consider the appropriate factors in determining whether or not to impose a fine...."). Glick contends the record lacks any indication that the district court considered the requisite factors in assessing the $100,000 fine, and therefore the fine must be vacated.[10]

■ Section 5E1.2(a) requires a district court to "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). 18 U.S.C. §§ 3553(a) and 3572(a) require the district court to consider certain factors to

---

**9.** Glick may not have exercised fiduciary power over the entire Welfare Fund, or even with respect to the monies he forwarded to Loeb. Glick did, however, exercise fiduciary power in regard to those assets he used to pay his commissions. *See Blatt v. Marshall,* 812 F.2d at 812 ("An entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary.").

**10.** Most of the cases Glick relies upon in asserting this argument involve the imposition of restitution payments pursuant to § 3663(a)(1) and § 3664(a). Glick's reliance upon these cases is misplaced. The imposition of restitution involves "a separate statutory scheme ... which includes its own independent consideration of defendant's ability to pay." *United States v. Brandon,* 17 F.3d 409, 461 (1st Cir.1994).

assess the appropriate fine, such as the defendant's income, earning capacity and financial resources. The burden is upon the defendant to show inability to pay the fine. *See United States v. Sasso,* 59 F.3d 341, 352 (2d Cir.1995); *United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991).

18 U.S.C. § 3572(a)(1) requires the district court to *consider* a defendant's income, earning capacity and financial resources in assessing the appropriate fine. The provision does not, however, require the district court to articulate that consideration. *See Marquez,* 941 F.2d at 65. Furthermore, "[w]here a fine falls within the Guidelines range, there is no requirement that the court state why it chose that fine." *Sasso,* 59 F.3d at 352. Here, the applicable Guideline range for Glick was from $10,000 to $2,600,000. The imposed fine of $100,000 falls within the lower end of this range. Furthermore, the district court adopted the presentence report, which considered Glick's financial condition and ability to pay. In light of these facts, we will not disturb the imposition of the fine merely because the district court chose not to articulate its considerations of the requisite factors.

Second, Glick argues the imposition of any fine in this case was inappropriate as a matter of law because Glick had almost no assets or net worth in his own name. Glick alleges the district court relied upon his wife's income to conclude Glick could pay the fine, which unfairly punishes Ms. Glick. The presentence report found that the Glicks had a net monthly positive cash flow of $11,603, which would be sufficient to make installment payments on the $100,000 fine. The presentence report also found that Glick had transferred title of his residence in Boca Raton, Florida to his wife on September 15, 1992. The residence was, at the time of the presentence report, valued at $800,000 and had approximately $400,000 in equity.

A district court may draw reasonable inferences from circumstantial evidence to determine whether a defendant has adequate funds to pay a fine. *See United States v. Orena,* 32 F.3d 704, 716 (2d Cir.1994). Here, the district court could have properly inferred that both Glick and his wife benefited from the fruits of Glick's illegal activities, thus making their shared income subject to penalty. The district court could have also properly inferred that Glick transferred the title of his house to his wife in an attempt to shield the property from potential government action. It appears from the record that the government began investigating the activities of Glick and HIG in September of 1992, the same time Glick transferred the title of the Boca Raton residence. *See United States v. Lombardo,* 35 F.3d 526, 527–28 (11th Cir.1994) (finding that where defendant transferred title to residence after being informed of government's investigation, "the district court could have justifiably concluded that [the defendant] was trying to hide his assets, a factor that the court was permitted to consider in imposing the fine."). We conclude there was sufficient evidence in the record from which the district court could properly infer that Glick could pay the fine.

### Conclusion

For the reasons stated above, the judgment of conviction and sentence imposed by the district court are affirmed.