UNITED STATES of America,
Appellee,

v.

Gloria STEVENS and Thomas M.
McLaughlin, Defendants,

Joseph Gall, Defendant–Appellant.

Docket Nos. 97–1260, 97–1586,
98–1348, 98–1496.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 15, 2000

Decided: April 17, 2000

2

Thomas J. Butters, Butters, Brazilian & Small, Boston, MA, for Appellant.

Michael E. Runowicz, Denise Derby, Assistant United States Attorneys (Stephen C. Robinson, United States Attorney for the District of Connecticut), for Appellee.

Before: KEARSE, CALABRESI, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Joseph Gall, defendant-appellant, appeals from orders of the United States District Court for the District of Connecticut.(Alan H. Nevas, *Judge* ), directing him to make restitution in the amount of $13,-717,630, pursuant to the Victim and Witness Protection Act of 1982 ("VWPA"), as amended, 18 U.S.C. §§ 3663–3664 (1999), and denying reconsideration of that order. Gall contends that the restitution order is invalid because it was entered more than 90 days after his sentencing and because the district court failed to consider statutory factors governing restitution. For the reasons that follow, we affirm the restitution of the district court. By a separate summary order, we have affirmed the judgment of the district court with respect to all other issues on appeal.

## I. FACTUAL BACKGROUND

Gall was convicted on 24 counts arising out of insurance fraud and tax fraud. Only the facts necessary to an understanding of the restitution order that is a part of his sentence are recounted in this opinion. Gall was the president and chief executive officer of Employee Staffing of America, Inc. ("ESA"), a temporary employee agency that leased employees to client companies. For a fee, ESA assumed, on behalf of the client companies, an employer's fiduciary responsibilities for the leased employees, including the provision of workers' compensation insurance, unemployment insurance, and federal payroll tax withholding and reporting. A company obtains workers' compensation insurance protection by one of two methods. It can purchase insurance in the standard or voluntary market by submitting an application directly to an insurance carrier and paying the premium associated with that policy. Alternatively, if a business entity is unable to obtain insurance through the voluntary market, it can still do so through the "involuntary market" or assigned risk plan or pool created by State worker protection regulation. Under the latter system, an insurance application is assigned to a particular insurance company, which is required to accept the application at state-approved premium rates. In both markets, the insurance premium is calculated primarily on the basis of the size of the employer's payroll, the degree of risk associated with the jobs held by the covered employees, and the employees' injury history.

Beginning in the mid–1980s, Gall conceived of an elaborate scheme to defraud workers' compensation insurance providers. The heart of the scheme was the intentional under-reporting of the size of the ESA payroll and its job risk classifications. Unbeknownst to the insurers, Gall also caused unauthorized insurance certificates to be issued to his client companies, thus concealing their existence from the insurers who would otherwise have factored into ESA's premiums the potential exposure associated with these companies. As a result of these misrepresentations, Gall obtained coverage at artificially low initial premium rates. Although the initial rates were to have been revised as appropriate after end-of-policy audits, Gall re-

peatedly obstructed the insurers' efforts to conduct such audits.

In addition to fraud on the insurance providers, Gall engaged in a conspiracy to defraud the Internal Revenue Service (the "IRS") and the Social Security Administration (the "SSA") by impeding their efforts to calculate and collect payroll taxes for employees contracted by ESA and another temporary employee agency to client companies, as well as for employees who worked for Gall's companies. Losses resulting from this tax fraud were not a part of the restitution order.

## II. PROCEDURAL HISTORY

In July 1995, a federal grand jury returned a superseding indictment against Gall, charging him with 24 counts arising from the insurance fraud and tax fraud. Gall was convicted after a jury trial on all counts: two counts of conspiracy, in violation of 18 U.S.C. § 371; eight counts of mail fraud, in violation of 18 U.S.C. § 1341; nine counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of making false statements to federally insured financial institutions, in violation of 18 U.S.C. § 1014; and three counts of willful failure to file income tax returns, in violation of 26 U.S.C. § 7203.

On April 4, 1997, the district court held an extensive sentencing hearing and determined, among other things, that the insurance fraud caused in excess of $13 million in financial loss to the insurance companies. At the conclusion of this hearing, Gall was sentenced primarily to 110 months of incarceration, followed by five years of supervised release, and restitution. The court decided to postpone the order of restitution because it lacked adequate information about Gall's financial situation. *See* 18 U.S.C. § 3663(a)(1)(B)(i).[1]

It directed Gall to provide full financial disclosure to the probation department, including, but not limited to, "a complete disclosure of all interest that you have in any entity, whether it be ... a limited partnership or any other form of ownership." Tr. 4/4/97 Sentencing Hr'g, at 252. Gall was further directed to meet with the Government's counsel and the probation department to attempt to agree on the amount of restitution. The judgment of conviction entered on that same day stated that a separate order of restitution would follow. On July 24, 1997, the court held a follow-up hearing on restitution. By order dated July 30, 1997, the court directed Gall to make restitution in the amount of $13,717,630. Subsequently, the district court denied the defendant's motion to vacate the order of restitution. *See United States v. Gall,* No.Crim. 3:95CR98, 1998 WL 387707 (D.Conn. June 1, 1998). This consolidated appeal followed. We consider only the appeal from the order of restitution in this opinion.

## III. DISCUSSION

■ We review an order of restitution for abuse of discretion. *See United States v. Kinlock,* 174 F.3d 297, 299 (2d Cir.1999). Section 3663 of title 18 of the United States Code authorizes a federal court, when sentencing a defendant convicted of an offense under title 18, to order restitution to a victim or, if the victim is deceased, to the victim's estate. *See* 18 U.S.C. § 3663(a)(1)(A). In deciding whether to order restitution, the court shall consider the amount of loss caused by the offense of conviction, the defendant's financial resources, the financial needs and earning ability of the defendant and the defendant's dependents, and other factors which the court deems appropriate. *See id.* § 3663(a)(1)(B)(i).

---

1. This subsection provides that a court shall consider:
 (I) the amount of the loss sustained by each victim as a result of the offense; and
 (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
 18 U.S.C. § 3663(a)(1)(B)(i).

The procedures for issuing and enforcing restitution orders are set forth in § 3664. This section requires, among other things, a sentencing court to direct the probation officer to prepare a presentence or other report detailing the losses sustained by each victim, any restitution stipulated by plea agreement, and the economic resources of each defendant. *See id.* § 3664(a). This information is then disclosed to both the defendant and the prosecution. *See id.* § 3664(b). The statute provides that if the amount of loss cannot be determined at least ten days before sentencing, "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." *Id.* § 3664(d)(5). A victim may "petition the court for an amended restitution order" if the victim thereafter discovers additional losses and shows good cause for not including those losses in the initial restitutionary request. *Id.*

### A. The 90–Day Rule

■ Gall argues that the order of restitution in question must be vacated because it was not issued within 90 days after his sentence was imposed. Although § 3664(d)(5) refers to a 90–day period for the "final determination of the victim's losses" rather than for the entry of a restitution order, at least two other circuits have construed "final determination" to mean the entry of the restitution order. *See United States v. Grimes,* 173 F.3d 634, 639 (7th Cir.1999) ("[I]f the victims' losses are not ascertainable by 10 days before the defendant is sentenced, the judge shall defer the entry of the order of restitution till up to 90 days after imposing the rest of the sentence."); *accord United States v. Vandeberg,* 201 F.3d 805, 813 (6th Cir. 2000). We agree with the Sixth and Sev-

enth Circuits that § 3664(d)(5) contemplates the entry of the restitution order within the 90–day period; the provision that a victim may "petition the court for an amended restitution order" would have no meaning unless the order had been entered.

■ In this case, the restitution order was entered on July 30, 1997, 117 days after the rest of Gall's sentence was imposed by the judgment of conviction dated April 4, 1997. However, Gall himself caused the extended delay. The restitution order could not be issued at the April 4, 1997 sentencing hearing because, as the district court found, "[Gall] has been stonewalling from the beginning and [has continued] to stonewall right up until 3:45 on the day of sentencing" and has been "flouting the authority of the court" by concealing significant assets from the prosecutors, the probation department, and the court. Tr. 4/4/97 Sentencing Hr'g, at 207–08. This pattern of obfuscation continued with his disregard of the court's order to provide additional financial disclosure at subsequent meetings with the U.S. Attorney's Office and the probation department; his submission of unsworn financial documents; and his refusal to allow cross-examination by the prosecution to verify the information in his financial affidavit. In addition, a June 30, 1997 restitution hearing—which would have been within the 90–day period—was rescheduled due to Gall's illness. That the last continuance was occasioned by circumstances beyond Gall's control does not negate the fact that the defendant caused the bulk of the delay in bad faith. Congress could not have intended to permit offenders to subvert the VWPA by using dilatory maneuvering to defeat a sentence of restitution.[2] *See, e.g.,*

2. The 90–day limit in subsection (d)(5) was added as part of the 1996 amendments to 18 U.S.C. § 3664. *See* Antiterrorism and Effective Death Penalty Act of 1996 Pub.L. No. 104–132, § 206, 110 Stat. 1232 (1996). The legislative history contains no explanation of the rationale behind the limitations period.

However, Senate Report No. 104–179, which was adopted as the Conference Report for the Victims Justice Act of 1995, *see* 142 Cong. Rec. 7433, 7462 (Apr. 15, 1996), noted:

The committee ... intends that ... the defendant's assets and ability to pay be subject to strict review by the court. In particular,

*Grimes,* 173 F.3d at 639 (noting that § 3664 confers rights on victims, not on offenders). Moreover, to vacate the restitution order where the defendant himself ran out the 90–day clock would be to reward him for willful defiance of the court's orders. This we decline to do.

▪ The concept of holding a defendant accountable for bad-faith delays is well-established. For example, we have held that where a defendant has engaged in "stonewalling and other misconduct" to delay trial, a court may proceed with trial even if doing so would intrude on the defendant's right to be present at all stages of trial. *See United States v. Nichols,* 56 F.3d 403, 418 (2d Cir.1995) (internal quotation marks and citation omitted). We have also held that a defendant is unlikely to have a viable speedy trial claim where the excessive lapse of time between indictment and trial was largely due to her efforts to evade arrest. *See United States v. Blanco,* 861 F.2d 773, 779–80 (2d Cir. 1988); *see also United States v. Albanese,* 554 F.2d 543, 549 (2d Cir.1977) ("When a defendant's own actions . . . have caused the delay between the commission of the crime and the entering of prison, he ordinarily will not be heard to contend that the delay constitutes cruel and unusual punishment."). Similarly, we hold that the 90–day clock in § 3664(d)(5) may be tolled by the defendant's own purposeful misconduct.[3] Whether a defendant has engaged in such misconduct is a question of fact for the sentencing court which we review for clear error.

Ordinarily, we would remand to the district court to determine the number of days that should be tolled by the defendant's refusal to make financial disclosures. The preferred course of action is to make factual findings on the record. However, remand is unnecessary where the defendant cannot show that the delay caused prejudice to his or her defense. "A non-constitutional error . . . is harmless if it is 'highly probable' that the error did not contribute to the verdict." *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977) (quoting R. Traynor, *The Riddle of Harmless Error* 35 (1970)); *see also United States v. Jean–Baptiste,* 166 F.3d 102, 108 (2d Cir.1999); *United States v. Castano,* 999 F.2d 615, 618 (2d Cir.1993). Although these cases dealt with errors at trial, we believe the same standard of review should govern errors during the sentencing phase.

Moreover, although our Circuit has not previously applied the harmless-error doctrine to § 3664(d)(5), we have regularly found sentencing errors that did not affect substantial rights to be harmless. *See, e.g., United States v. Rivera,* 192 F.3d 81, 88 (2d Cir.1999) (harmless-error analysis applied to failure to give notice of court's intent to depart upwardly), *cert. denied,* —— U.S. ——, 120 S.Ct. 965, 145 L.Ed.2d 836 (2000); *United States v. Glick,* 142 F.3d 520, 526 (2d Cir.1998) (calculation of improper benefits); *United States v. Chen,* 127 F.3d 286, 292 (2d Cir. 1997) (court's failure to state on the record its reasons for imposing 120 months' imprisonment); *United States v. Smith,* 987 F.2d 888, 892–93 (2d Cir.1993) (exclusion of psychiatric testimony during sentencing); *see also* Fed.R.Crim.P. 52(a). We also note that the Court of Appeals for the Sixth Circuit has specifically applied the harmless-error doctrine to the VWPA. *See Vandeberg,* 201 F.3d at 814 (holding that failure to afford defendant opportunity to be heard within 90 days was harmless

---

the committee is concerned that defendants not be able to fraudulently transfer assets that might be available for restitution.
S. Rep. No. 104–179, at 20 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 933. In our view, the 90–day limit on the entry of a restitution order is more consistent with Congress's concerns about preventing the dissipation of a

defendant's assets, than with protecting a defendant from a drawn-out sentencing process.

3. Since the issue is not before us, we do not decide whether the 60–day post-discovery time limit in 18 U.S.C. § 3664(d)(5) may be also be tolled by a defendant's misconduct.

error where he was able to object to the amount of restitution thereafter).

In this case, the delay in issuing the restitution order, if error at all, was harmless, because it is nearly certain (and *a fortiori* more than highly probable) that the delay did not adversely affect Gall's substantial rights. The district court heard argument regarding restitution in April 1997 and again in July 1997. On both occasions, Gall was present, was represented by counsel, and had the opportunity to make objections, to call witnesses, and to offer updates, and in fact did so through counsel. The defendant has not alleged that any documents or witnesses became unavailable after the 90–day period had run. Neither has he pointed to any change in his financial status during the delay that adversely affected either the imposition or amount of restitution. Therefore, the defendant is not entitled to relief from the order of restitution based on the expiration of the 90–day period.

### B. The Restitution Factors

 Gall also contends that the district court failed to consider his financial circumstances and the needs of his dependents. This argument is without substance. Courts are statutorily required to consider the enumerated restitution factors, but not to make detailed factual findings as to each factor. *See* 18 U.S.C. § 3663(a)(1)(B). Instead, the record must contain "an affirmative act or statement allowing an inference that the district court in fact considered" the mandated factors. *Kinlock,* 174 F.3d at 300 (internal quotation marks and citation omitted); *see also United States v. Germosen,* 139 F.3d 120, 130 (2d Cir.1998).

Here, the transcripts of the post-conviction proceedings show that the district court took into account the relevant variables. After holding a day-long hearing to ascertain the amount of loss, the court decided to postpone the issuance of the restitution order with the specific purpose of ensuring full financial disclosure from Gall. It then conducted a separate hearing on Gall's financial condition. During the latter proceeding, the court questioned the defendant at length about specific assets (including real estate, bank accounts, and mortgages) that were either mentioned in the presentence report or raised by the Government. Thereafter, the court issued an order which expressly stated that "[o]n July 24, 1997, Joseph Gall, represented by counsel, was presented before this Court to determine restitution, and his ability to remit, now and in the foreseeable future." Order dated July 30, 1997. As to Mrs. Gall, the sole dependent, the district court "took into consideration the fact that Gall married on the eve of his surrender date and that his wife ran a successful business which she had purchased from Gall." *See Gall,* 1998 WL 387707, at *2 n. 1. Based on this record, we are persuaded that the district court properly considered the restitution factors. Accordingly, the order of restitution is affirmed.

### CONCLUSION

For the reasons explained above, we affirm the order of the district court directing defendant Joseph Gall to make restitution in the amount of $13,717,630.