[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT. 25, 2001
THOMAS K. KAHN
CLERK

_____

Nos. 00-10296 and 00-14669

_____

D.C. Docket No. 98-00720-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MYAT MAUNG

Defendant-Appellant.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

**(September 25, 2001)**

Before TJOFLAT, CARNES and REAVLEY*, Circuit Judges.

_____
* Honorable Thomas M. Reavley, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

CARNES, Circuit Judge:

Myat Maung was convicted of on one count of conspiring, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 2321(a) by receiving and possessing with intent to sell cars with altered identification numbers, and on one count of exporting stolen cars in violation of 18 U.S.C. § 553. The district court sentenced Maung to 39 months in prison and ordered him to pay $218,895.68 in restitution for his crimes. Maung appeals his conviction, his prison sentence, and the restitution order. We affirm the conviction, but reverse and remand the prison sentence because it improperly applied a sentencing enhancement, and reverse the restitution order because it was untimely.

## I. FACTS AND PROCEDURAL HISTORY

### A. FACTS

To understand the crimes of which Maung was convicted, it is necessary to understand the nature of his business. Maung was the owner and president of Transglobal Shipping, Inc., a Miami shipping company. Transglobal was a small company, with four or five employees. Maung was intimately familiar with all of the details of Transglobal's operations.

Transglobal was a non-vessel-operating common carrier, which means it did not own ships but rather was in the business of preparing goods for export and delivering them to a shipping line. Those preparations included receiving goods and having them loaded into containers, as well as completing the necessary exportation paperwork for the goods on the customers' behalf. To be able to legally export a car, a shipper must first clear the car through Customs by presenting various documents, including the car's title, bill of sale, and a power of attorney from the car's owner. Customs then stamps the documents, authorizing the export, after which the shipper is required to wait 72 hours before the car is shipped. Before the car is shipped, the shipping line prepares a bill of lading which documents the nature of the cargo, the owner, the shipper (in this case, Transglobal), and the consignee. After exporting a car, Transglobal kept files containing all the documents relating to each car shipped.

Maung's role in the conspiracy for which he was convicted was uncovered by chance. While in Kaliningrad, Russia, teaching a course on automobile theft to Russian police officers, Customs Agent Andrew Diamond was asked by the Russian officers to look at six cars which had been seized at the Port of Kaliningrad. When Diamond inspected the cars, he discovered that their vehicle

3

identification numbers (VINs) had been altered.[1] Agent Diamond took the shipping paperwork for the vehicles back to the U.S., where he began an investigation.

Determining that the cars had been shipped by Transglobal, Diamond visited its offices and asked Maung for his files relating to the six cars. Maung gave Diamond a log book and files for the six cars; when Diamond asked Maung who had been the customer for those six cars Maung told him the customer was "Hans Kluge." However, the logbook listed, in Maung's handwriting, the shipper for each of the six cars as "Rafal." "Rafal," as Diamond would later discover, was Rafal Kubicki, one of Maung's co-conspirators.

When Diamond asked how Kluge had paid Transglobal for the shipments, Maung produced a file which contained correspondence between Maung and Kluge, photocopies of money orders which Maung said were used to pay for the shipments, a photocopy of Kluge's driver's license, and a business card for Kluge Automobile. Maung initially told Diamond that he had not arranged any other shipments to Kluge other than the six Russian cars.

---

[1] Agent Diamond discovered the alteration by comparing the cars' "public" VIN plates to their "confidential" VIN plates. "Confidential" VIN plates are placed by car manufacturers in their cars in places known only to the manufacturer and law enforcement, for the purpose of allowing law enforcement to tell when a car's VIN has been altered.

Upon further investigation, Diamond learned that each of the six cars had been stolen in South Florida during October 1996. Diamond asked German authorities to investigate Kluge; they determined that the "Kluge" driver's license was a forgery and that Kluge Automobile did not exist at the address listed on the business card Maung had shown Diamond. Diamond then obtained a search warrant for the offices of Transglobal Shipping.

The warrant was executed on July 22, 1997. The agents found counterfeit manufacturers' sales stickers in a desk which also contained Maung's personal bank statements. They found counterfeit temporary automobile tags above the ceiling tiles in the bathroom, and blank car invoices on top of a cabinet. The agents found credit cards for several individuals, and a passport for Anwerali Sunderji. Sunderji's 1995 Mercedes with his passport in it had been stolen in South Florida on October 30, 1996. The agents seized all of those items as well as paperwork relating to the shipments of other cars.

Following the search, Agent Diamond analyzed the paperwork relating to Transglobal's shipments of other cars. He discovered numerous irregularities in the files for 33 of the 52 cars shipped between September 27, 1996 and November 7, 1996. None of those 33 cars had been cleared for export by Customs; therefore, all of the Customs' stamps in Maung's files for those cars were counterfeit. Agent

5

Diamond was able to link most of the cars to "Kluge" or "Kluge Auto." Further, he discovered that the name "Rafal," which frequently appeared in the logbook, did not appear in any of paperwork or files for the cars. Twenty-six of the cars had "bad," *i.e.*, nonexistent, VINs; four had "good" or existent VINs but those VINs did not match the cars to which they were assigned in Maung's paperwork. When Diamond attempted to locate the notaries whose seals were affixed to various documents in the files, he could find only one of them. She testified at trial the notary stamp used in Transglobal's paperwork was expired and all of her signatures on that paperwork were forgeries.

In August 1998, the grand jury subpoenaed all of Transglobal's records. Diamond compared the subpoenaed records to the records for the 33 suspect cars and discovered that, unlike the records of the 33 suspect cars, the subpoenaed records (with one or two exceptions) contained records of payment by the owner of the goods. Additionally, Diamond verified that each of the cars in the subpoenaed files had been cleared by Customs for export, in contrast to the 33 suspect cars, none of which had been cleared for export.

At trial, a friend of Maung's, Walter Crane, testified that he was present when Rafal Kubicki met with Maung about shipping cars. Crane also testified that he spoke with Maung about Maung's business dealings with Kubicki. According

to Crane, Maung said that the cars he was shipping for Kubicki were stolen and their VINs had been changed. Maung said that Kubicki's associates stole the cars, and Kubicki got the counterfeit VIN plates from Europe. Maung admitted that the cars had not cleared U.S. Customs, and said Kubicki was supplying fraudulent documents and paying him in cash. Maung showed Crane a passport for Hans Kluge, and said Kluge was the person to whom the stolen cars were being shipped. Maung also showed Crane correspondence between Maung and Kluge, which Maung said would "cover his butt" if he ever had problems with Customs.

Meanwhile, in November 1996, a Miami-Dade police officer had tracked a Lo-Jack signal (an electronic signal used to locate cars) for a stolen gold Mercedes to CMA Towing, a company owned by Miguel Torres. When the gold Mercedes was recovered, investigation revealed that the VIN plate had been changed. The car contained an export package which indicated that the car was to be sent out of the country, but Customs records showed the car had never been cleared for export. The export package contained fake Customs documents, and a passport photograph of "Hans Kluge." The export power of attorney for the vehicle was in the name of "Hans Kluge."

At trial, Crane testified that he was present at a November 1996 meeting between Maung, Torres and Kubicki at which they discussed the seizure of a gold

Mercedes by law enforcement. During that discussion Torres had described how the police had shown up after the car's Lo-Jack device was activated. According to Crane, Maung had panicked as a result of this seizure, and decided to stop shipping cars for Kubicki.

Finally, in August 1998, Diamond arrested two car thieves as they were preparing to steal a car. Those arrests led to a search of the house of Manfred Sambulski, where agents discovered two cars in Sambulski's garage in the process of having their VINs altered.

## B. PROCEDURAL HISTORY

Maung was charged in two counts of a four-count superseding indictment; his co-defendants were Sambulski, Kubicki, and Torres.[2] On the first count, Maung was charged with conspiring, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 2321(a) by receiving and possessing with intent to sell motor vehicles, knowing that their identification numbers had been removed or altered. On the second count, Maung was charged with exporting three of the stolen cars which Agent Diamond had discovered in Russia, in violation of 18 U.S.C. § 553(a)(1) and (2).

---

[2]Sambulski and Torres pleaded guilty; Kubicki is a fugitive.

8

The indictment made these allegations. Sambulski and Kubicki used Transglobal as a conduit to ship stolen cars to Eastern Europe. Pursuant to their scheme, thieves stole late model SUVs and Mercedes from various locations in South Florida. The stolen cars then were taken to garages where Sambulski altered the cars' VINs to match those on title documents which he had either forged or acquired illegally. Sambulski sold some of these stolen cars to Rafal Kubicki in the United States. Kubicki applied counterfeit Customs clearance stamps to the fraudulently obtained titles giving the appearance that the stolen cars had been properly cleared for export by Customs.

The indictment also alleged that Maung, through Transglobal, arranged for the export of some of the stolen cars that Kubicki bought from Sambulski.[3] Maung arranged for the stolen cars to be placed in containers and loaded onto ships for export. The arrangements for actually towing the stolen cars from the garages to the loading station were made by Torres as owner of CMA Towing. Maung's primary role in the scheme was the preparation of false shipping records and retention of the fraudulent titles in case of a Customs investigation.

---

[3] Maung contended, and the government did not dispute, that Kubicki had been using another shipping company before Maung became involved. After that company backed out, Kubicki sought out Maung's services.

A jury convicted Maung on both counts against him.  To calculate Maung's prison sentence, the district court started with a base offense level of eight under U.S.S.G. § 2B6.1(a), which applies to convictions for altering or removing motor vehicle VINs or trafficking in vehicles with altered VINs.  It then raised that base level by eleven under U.S.S.G. § 2B6.1(b)(1), which incorporates U.S.S.G. § 2F1.1, because the total loss was more than $800,000.  Finally, the district court added a two-level enhancement against Maung for "being in the business of receiving and selling stolen property." U.S.S.G. § 2B6.1(b)(2).   This brought Maung's total offense level to 21, which, together with his lack of a criminal history, made him subject to a sentence of between 37 and 46 months under the sentencing guidelines.  The result was that on January 5, 2000, the  district court sentenced Maung to 39 months imprisonment, followed by three years' supervised release.

On the same date it sentenced Maung,  the court ordered him to pay restitution, but it deferred determination of the amount of restitution "pending further hearing."  More than six months later, on June 16, 2000, the government moved the district court to set the amount of restitution Maung must pay, noting that the parties had unsuccessfully attempted to negotiate an agreed amount of restitution. Maung opposed the government's motion, in part, on the ground that 18

10

U.S.C. § 3664(d)(5) requires a district court to make a final determination of the amount of restitution within 90 days of sentencing, and more than 90 days had passed between Maung's sentencing and the government's motion for a final restitution order.

At a hearing on August 25, 2000, the district court denied Maung's objection and accepted the government's argument that because of negotiations between Maung and the government about stipulating to the amount of restitution, the 90-day statutory period should be extended. The court entered an order that Maung pay $218,895.67 in restitution. On August 29, 2000, the court amended its final judgment to incorporate that amount of restitution.

Maung timely appealed from the initial judgment and the amended judgment, and we consolidated the two appeals.

## II. DISCUSSION

On appeal, Maung raises a number of challenges to his conviction, his sentence, and the district court's order that he pay restitution. Two of them have merit: his contention that the district court improperly imposed on him the two-level sentencing enhancement for being "in the business of receiving and selling

stolen property"; and his contention that the final restitution order is invalid because it was entered more than 90 days after he was sentenced.[4]

## A. "IN THE BUSINESS OF RECEIVING AND SELLING STOLEN PROPERTY"

Under the federal sentencing guidelines, a base offense level governed by §2B6.1 may be enhanced by two levels if "the defendant was in the business of receiving and selling stolen property." U.S.S.G. §2B6.1(b)(2). After properly applying §2B6.1 to determine Maung's base offense level, the district court added the two-level "in the business" enhancement. Maung argues that the district court erred in doing so because he was not "in the business of receiving and selling stolen property." When a defendant challenges the district court's application of the sentencing guidelines, we review the district court's underlying findings of fact for clear error and application of the guidelines to those facts de novo. United States v. Jamieson, 202 F.3d 1293 (11th Cir. 2000) (citations omitted).

We have never had occasion to discuss the "in the business" sentencing enhancement. The circuits which have addressed the meaning of the

---

[4]Having carefully considered them, we reject without further discussion Maung's other contentions.

12

enhancement[5] generally have agreed that a thief who sells goods that he himself has stolen is not "in the business of receiving and selling stolen property." See, e.g., United States v. McMinn, 103 F.3d 216, 219-21 (1st Cir. 1997); United States v. Sutton, 77 F.3d 91, 94 (5th Cir. 1996); United States v. Warshawsky, 20 F.3d 204, 214-15 (6th Cir. 1994); United States v. Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990); but see, United States v. Collins, 104 F.3d 143, 144 (8th Cir. 1997) (holding that a thief was "in the business" when he delivered the goods he had stolen to an auction house and split the proceeds with the auction house after the goods were auctioned off).

However, the circuits have split on the proper test for determining whether a defendant, who was not the actual thief, was "in the business" or not. Two tests have emerged. The "fence" test, adopted by the Fifth, Sixth, and Seventh Circuits, requires proof that the defendant was a person who bought and sold stolen property, and thereby encouraged others to commit property crimes. See Warshawsky, 20 F.3d at 214; United States v. Esquivel, 919 F.2d 957, 959-60 (5th Cir. 1990); Braslawsky, 913 F.2d at 468. The "totality of the circumstances" test,

_____

[5]Most of the reported cases interpreting the "in the business" enhancement involve U.S.S.G. §2B1.1(b)(4)(B), which imposes a four-level enhancement for basic theft crimes "[i]f the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property." Their analysis of the phrase "in the business of receiving and selling stolen property" in interpreting §2B1.1(b)(4)(B) applies to the identical language in §2B6.1.

13

embraced by the First, Third, and Ninth Circuits, and perhaps by the Second Circuit, employs a "case by case approach with emphasis on the 'regularity and sophistication of a defendant's [criminal] operation.'" United States v. Zuniga, 66 F.3d 225, 228-29 (9th Cir. 1995) (quoting United States v. St. Cyr, 977 F.2d 698, 703 (1st Cir. 1992)); accord United States v. Cottman, 142 F.3d 160, 165-66 (3d Cir. 1998); see also United States v. Salemi, 46 F.3d 207, 209 (2d Cir. 1995). Under the "totality of the circumstances" test, at least, "[m]ore than isolated, casual, or sporadic activity [must] be shown before a business is found to exist." St. Cyr, 977 F.2d at 703-04.

Some courts have suggested that the difference between the two tests, if any, is not great. See Cottman, 142 F.3d at 167 n.9 (suggesting that the "totality of the circumstances" test might include the requirement that the defendant be a "fence"); Salemi, 46 F.3d at 209 ("We believe that any differences between the two tests are subtle at best."); but see Warshawsky, 20 F.3d at 215 (adopting the "fence" test after criticizing the "totality" approach as a "unwieldy case-by-case multi-factored balancing test").

Turning to whether the enhancement was appropriate in this case, Maung argues that the district court erred in applying the "in the business" enhancement to him because he did not personally receive or sell stolen property at all. Maung

14

claims he was merely a transporter of stolen property: a middleman, not a "fence."[6]

The government responds that the enhancement was appropriate because, under the

"totality of the circumstances," the sophistication and regularity of Maung's

conduct in exporting the stolen cars qualifies him as being "in the business of

receiving and selling stolen property." At the sentencing hearing, the government

also argued that while Maung himself never actually possessed the stolen vehicles,

he took constructive possession of them by preparing the forged shipping

paperwork, arranging for the containerization of the cars, and presenting the

paperwork and the cars to the shipping line. The district court agreed with the

government's arguments, finding that:

> [Maung] was in the business of receiving and selling and exporting
> the stolen property, these stolen cars through a regular sophisticated
> use of fraudulent documents and the utilization of the freight
> forwarding business and clearances through customs which enabled
> these stolen vehicles to be processed and shipped outside the United
> States.

We disagree.

The guideline requires that the enhancement be imposed when "the

defendant was in the business of receiving and selling stolen property." U.S.S.G. §

---

[6]Additionally, Maung contends that the shipment of the 33 stolen cars covered by the conspiracy count comprised so small a portion of Transglobal's total shipping business that it lacked the regularity required for a finding that he was "in the business" of dealing in stolen goods. Because we agree that the "in the business" enhancement does not apply to a defendant who did not himself receive and sell stolen property, we do not reach that contention.

15

2B6.1(b)(2) (emphasis added).  In interpreting a sentencing guideline, we must adhere to its plain meaning.  See United States v. Tham, 118 F.3d 1501, 1506 (11th Cir. 1997) ("[T]he language of the Sentencing Guidelines is to be given its plain and ordinary meaning."); United States v. Pompey, 17 F.3d 351, 354 (11th Cir. 1994) (same).  The plain meaning of guideline § 2B6.1(b)(2) is that the defendant himself, and not just his co-conspirator, must have received and sold stolen property.  A defendant who has not received and sold cannot be "in the business of receiving and selling."

This conclusion is supported by contrasting the "in the business" enhancement with its neighboring guideline, which allows an enhancement if "the offense involved an organized scheme to steal vehicles . . . ."  U.S.S.G. § 2B6.1(b)(3) (emphasis added); see also, e.g., U.S.S.G. § 2B3.1(b)(2)(E) (allowing a sentencing enhancement "if a dangerous weapon was brandished or possessed") The contrast between 2B6.1(b)(2)'s active, specific "the defendant was in the business" and the next subsection's more general and passive "the offense involved" indicates that the (b)(2) enhancement is focused upon the defendant's own activities, in contrast to the (b)(3) enhancement's focus on the offense, which includes the activities of co-conspirators for which the defendant is held responsible.

16

Case law further supports this interpretation of the §2B6.1(b)(2) "in the business" enhancement. The government has cited us to no case, and we have discovered hardly a one, in which a federal appellate court upheld the "in the business" enhancement against a defendant who did not personally participate in receiving and selling (or intending to sell) stolen property. See United States v. Coviello, 225 F.3d 54, 65-66 (1st Cir. 2000); United States v. Myers, 198 F.3d 160, 164 (5th Cir. 1999); Cottman, 142 F.3d at 162-63; Sutton, 77 F.3d at 92; Zuniga, 66 F.3d at 229; Salemi, 46 F.3d at 208; United States v. MacKay, 33 F.3d 489, 497 (5th Cir. 1994); Warshawsky, 20 F.3d at 206, 215; Esquivel, 919 F.2d at 959.[7]

In this case Maung, the defendant, was not personally "receiving and selling" stolen cars. Instead, he was processing phony paperwork and making arrangements to illegally export the cars to Eastern Europe. Even if we accepted the government's argument that Maung's actions put him in constructive

---

[7]Our own search located only one federal appellate case that is even arguably an exception. United States v. Collins, 104 F.3d 143, 144 (8th Cir. 1997). Collins upheld the application of the "in the business" enhancement to a defendant who had not himself sold stolen property, but who had delivered it to an auction house, which then sold it and split the profits with the defendant. Collins goes against the heavy weight of authority, as well as the plain meaning of the word "receiving," in concluding that the "in the business" enhancement can apply to the person who actually stole the property. This calls into question more generally the soundness of its interpretation of the "in the business" requirement. Moreover, in Collins, the defendant subjected to the "in the business" enhancement was splitting the profits of the sales of the stolen property with the auction house that was selling it. A partnership arrangement, which is not present here, arguably makes the defendant more of a seller of the property.

17

possession of the cars, and thereby constituted "receiving" them; there is no indication that Maung sold the cars. He was paid for his export services by Kubicki, but it was Kubicki and not Maung who sold the cars. There is no evidence that Maung had any contact with the purchasers or shared in the proceeds from the sale. Because Maung was not selling stolen property, he could not have been "in the business of receiving and selling stolen property." The district court therefore erred when it added the "in the business" enhancement to Maung's base offense level.[8]

## B. TIMELINESS OF THE RESTITUTION ORDER

Maung next contends that the district court erred by entering an order setting the amount of restitution he was to pay after the 90-day statutory limit for finally determining the victims' losses had passed. We review de novo statutory interpretation issues and issues involving the legality of a criminal sentence, including a restitution order. United States v. Cobbs, 967 F.2d 1555, 1556 (11th Cir. 1992); United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991).

---

[8]Because we reverse Maung's sentence based on the plain language of the statute, we need not choose between the "fence" test and the "totality" test as alternative ways of applying of the "in the business" enhancement. However, the conflicts in the decisions interpreting this guideline indicate the need for a clarifying amendment or commentary from the Sentencing Commission.

18

The controlling statute provides that:

> If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5). Three other circuits have read this provision as requiring the district court to enter the restitution order within 90 days of sentencing. See U.S. v. Jolivette, 257 F.3d 581, 584 (6th Cir. 2001) ("[W]hen the 90-day clock runs out, the judgment of conviction and sentence, including the restitution provision, becomes final by operation of the statute. . . . [B]ecause there was no timely judicial determination of the restitution amount, the judgment contains no enforceable restitution provision."); accord United States v. Stevens, 211 F.3d 1, 5 (2d Cir. 2000); United States v. Grimes, 173 F.3d 634, 639-40 (7th Cir. 1999). We agree with this reading of the statute. If the court believes more time is required to ascertain the amount of victim losses, it can postpone sentencing and thereby put off the start of the 90-day period. What a court generally may not do, however, is impose a sentence and then delay determination of the amount of losses more than 90 days from sentencing.

Maung was sentenced on January 5, 2000, while the order setting the amount of restitution was not entered until August 25, 2000, way beyond the 90-

19

day period.  The government argues that the 90-day statutory period can be tolled, and that it was tolled in this case because the delay did not prejudice Maung.   The government may be correct on the first point, at least one circuit having held that the 90-day period can be tolled under certain circumstances.  See Stevens, 211 F.3d at 4-5.  In Stevens, however, the delay in determining the amount of the victims' losses was caused by the defendant's "pattern of obfuscation" and "willful defiance of the court's orders."  Id. at 4-5.   The government does not argue that any obfuscation or defiance by Maung caused the delay in entry of the order setting the amount of restitution.

Although Maung was not at fault for the delay, the government argues that the 90-day period should still be tolled.  It is enough, the government says, that Maung had a full opportunity to contest the amount of the restitution award at the August 25, 2000 hearing, and so was not prejudiced by the delay.  But there is no prejudice requirement in the statute, and we are not convinced that we should read one into it.  The government argues that the 90-day time limit was designed by Congress to protect victims against the dissipation of a defendant's assets, and not to protect defendants against a drawn-out sentencing process. See Stevens, 211 F.3d at 4-5; Grimes, 173 F.3d at 639.  Vacating the restitution award against Maung for untimeliness will, according to the government, thwart the

20

Congressional intent behind the 90-day provision by denying Maung's victims any repayment at all. But we are governed by the language Congress enacts, not by purported designs or intentions that conflict with that language. See INS v. Cardoza-Fonseca, 480 U.S. 421, 452-53, 107 S.Ct. 1207, 1224 (1987) (Scalia, concurring) ("Judges interpret laws rather than reconstruct legislators' intentions.").

In interpreting a statute we look first to the plain meaning of its words, and do not consider legislative history unless the statutory text is unclear. United States v. Gonzales, 520 U.S. 1, 6, 117 S.Ct. 1032, 1035 (1997) ("Given [a] straightforward statutory command, there is no reason to resort to legislative history."); CBS, Inc., v. Primetime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) ("[W]e assume the Supreme Court, in saying that, said what it meant."). If the meaning of a statute is clear on its face, we may only look to legislative history if that plain meaning produces "a result that is not just unwise but is clearly absurd." Id. at 1228 (quoting Merritt v. Dillard Paper Co., 120 F.3d 1181, 1188 (11th Cir. 1997)).

The requirement, plain on the face of § 3664(d)(5), that a district court enter a restitution order within 90 days of sentencing, and not thereafter, generally will not produce an absurd result. A strict 90-day limit might produce an absurd

result in cases where the defendant's own bad faith causes the entry of the order to be delayed beyond 90 days. See Stevens, 211 F.3d at 4-5 ("Congress could not have intended to permit offenders to subvert the VWPA by using dilatory maneuvering to defeat a sentence of restitution."). Allowing the defendant's own bad faith delay to foreclose the entry of a restitution order could conceivably put restitution in some cases in the defendant's own discretion. For that reason, we are not willing to say that the 90-day limitation is inexorable and can never be equitably tolled. We have no occasion to decide that issue in this case, anyway. The delay in this case was not caused by obstruction or bad faith tactics of the defendant. By all accounts, the parties negotiated in good faith, but were unable to reach agreement on the amount of restitution. There is no indication that the defendant was any more at fault for the delay than the government. In this situation, it is not plainly absurd to let the chips fall where the plain language of the statute indicates they should.

The district court failed to enter an order of restitution within 90 days of sentencing. The August 25, 2000 restitution order is therefore invalid.

### III. CONCLUSION

Maung's conviction is AFFIRMED; Maung's prison sentence is REVERSED and the case is REMANDED for re-sentencing; the order that Maung pay $218,895.68 in restitution is REVERSED.