[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 21, 2006
THOMAS K. KAHN
CLERK

No. 05-12504
Non-Argument Calendar

_____

D. C. Docket No. 04-00398-CR-RBP-PWG

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

JOHN G. GRANT, JR.,

Defendant-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(December 21, 2006)**

Before BIRCH, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

John G. Grant Jr. challenges his convictions for making false statements to a

federally-insured bank, in violation of 18 U.S.C. §§ 1014 and 2. On appeal, Grant argues that his convictions are not supported by sufficient evidence, and that, therefore, the district court erred in denying his motion for acquittal. He also argues that the jury instructions submitted in his case were erroneous and confusing, such that they prejudiced his trial. The government cross-appeals Grant's sentences, contending that the district court committed errors in sentencing Grant. Upon review of the record, we discern no error as to Grant's convictions, but we find that the district court erred in calculating Grant's sentence. Accordingly, we AFFIRM Grant's convictions, VACATE his sentence and REMAND this case for re-sentencing.

## I. BACKGROUND

Grant was the president and principal owner of Southern Pride Contractors, Inc. ("Southern Pride"), an Alabama company that did general contracting work on various government construction projects. Southern Pride had a business line of credit with Covenant Bank, the terms of which were governed by a commitment letter. Under the terms of the parties' agreement, Southern Pride was given a line of credit of up to $500,000. The bank secured the line of credit by claiming a security interest in Southern Pride's inventory and accounts receivable. The commitment letter required that Southern Pride provide Covenant Bank with

2

statements showing its accounts receivable, on a monthly basis. In addition, the letter stipulated that Southern Pride could only draw funds on its line of credit up to 80% of the value of the accounts receivable that it had pledged as collateral.

In August or September 2002, Southern Pride began pursuing a lucrative construction contract with the Anniston Army Depot in Anniston, Alabama (the "Anniston contract"). However, Southern Pride was having short-term financial difficulties; the record suggests that its $500,000 line of credit was almost fully exhausted by the fall of 2002.[1] Thus, in an apparent effort to increase its cash flow and hopefully procure the Anniston building contract, Southern Pride sought to raise its line of credit with Covenant Bank to $800,000.

In a meeting with Southern Pride's officers, Covenant Bank indicated that, in order to have its line of credit raised to $800,000, Southern Pride would be required to show that had accounts receivable of approximately $1 million. Subsequent to that meeting, in September 2002, Southern Pride began submitting statements to Covenant Bank showing monthly accounts receivable of approximately $1 million.[2] In reality, Southern Pride's actual accounts receivable

---

[1] At the sentencing hearing, a representative of the bank testified that, sometime around September 2002, the line of credit had an outstanding balance of approximately $496,000.

[2] Southern Pride submitted the following accounts receivable statements: September 2002 ($1,046,700); October 2002 ($1,089,000); November 2002 ($985,750); December 2002 ($889,000); April 2003 ($1,109,550); May 2003 ($1,112,000).

3

were substantially less than the amounts that were reported to the bank during this period. Although the line of credit was never increased as Southern Pride had hoped, it is undisputed that its submissions to the bank were not accurate, and that the company's financial position was much more dire than its monthly financial statements suggested. Southern Pride ceased its operations completely in 2003, and the bank was unable to collect the outstanding balance on the line of credit. After recovering approximately $12,000 from seizing a backhoe, the total amount of the bank's unrecovered balance was $484,137.84.

Following an investigation by the Federal Bureau of Investigation (FBI), Grant, as principal and owner of Southern Pride, was charged with six counts[3] of "knowingly mak[ing] any false statement or report" to a federally-insured bank for the purpose of influencing its action on a loan or advance, in violation of 18 U.S.C. § 1014. The indictment alleged that Grant had made, or had aided and abetted his subordinates in making, "inflated and overstated" reports with respect to Southern Pride's accounts, for the purpose of extending the company's line of credit, and that Grant had known that the actual submissions were "substantially less than what was stated." R1-1 at 1-2. In addition, Count Seven of the indictment alleged

---

[3] The indictment contained six counts under 18 U.S.C. § 1014, one for each monthly submission in which the company's accounts receivable amounts were overstated.

a count for bank fraud, 18 U.S.C. § 1344.[4] Count Eight alleged a separate count for conspiracy to defraud a federally-insured bank, 18 U.S.C. § 371. Grant's erstwhile comptroller, Michael Crisp, who had participated in the submissions to the bank during the period in question, was separately charged with violating 18 U.S.C. § 1014; he later pled guilty and testified against Grant at trial.

Grant's jury trial was held in January 2005. Following a two-day trial, the jury convicted Grant of all six counts of making a false statement to a federally-insured bank, in violation of 18 U.S.C. § 1014. The jury acquitted Grant of the conspiracy charge alleged in Count Eight. The district court sentenced Grant to a term of ten months, consisting of five months of imprisonment, followed by five months of home detention. These appeals followed.

## II. DISCUSSION

A. Grant's Appeal of the Convictions

Grant raises two issues on appeal. First, he contends that there was insufficient evidence to convict him of violating 18 U.S.C. § 1014. Second, he contends that the jury instructions that the district court submitted to the jury were erroneous and confusing, and that, as a result, his trial was prejudiced. We address each of these arguments in turn.

---

[4] The government voluntarily dismissed Count Seven prior to Grant's trial, and thus this charge was not submitted to the jury for a verdict.

5

1.  Sufficiency of the Evidence

Grant first challenged the sufficiency of the evidence at the close of his trial by moving for a judgment of acquittal, which the district court denied. Grant contends that this denial was in error. On appeal, we review the denial of a defendant's motion for acquittal *de novo*.[5] United States v. Perez-Tosta, 36 F.3d 1552, 1556 (11th Cir. 1994) (citations omitted). In considering the sufficiency of the evidence, we view all of the evidence in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor. United States v. LeCroy, 441 F.3d 914, 924 (11th Cir. 2006). We "cannot reverse a conviction for insufficiency of the evidence unless after reviewing the evidence in the light most favorable to the government, we conclude that no reasonable jury could find proof beyond a reasonable doubt." United States v. Jones, 913 F.2d 1552, 1557 (11th Cir. 1990) (citation omitted).

Grant's specific contention on appeal is that there was insufficient evidence that he "made" false statements to the bank. Essentially, Grant argues that, although he submitted falsified accounts receivable reports to Ashley Page, a loan

---

[5] The government argues that we should review the denial of acquittal under the plain error standard of review, since the gravamen of Grant's argument, at least in its present form, was not articulated before the district court. As is discussed subsequently, however, we need not apply plain error review in this case, since Grant's argument fails even under the more liberal *de novo* standard of review.

officer at Covenant Bank, those reports remained in Page's possession and the bank never became aware of them nor relied upon them. Grant suggests that the submission of the false reports to Page alone (who, according to Grant, was the sole bank employee who knew of the false reports) was akin to making a false statement and hiding it in a desk drawer, rather than circulating it within the bank. According to this novel argument, since the bank was not aware of the existence of the false statements, Grant could not be convicted of "mak[ing]" a false statement to the bank. 18 U.S.C. § 1014.

We reject this contention. We have made clear that an offense is complete under 18 U.S.C. § 1014 when it is established that (1) the defendant made a false statement or report; and (2) that he did so for the purpose of influencing the conduct of a federally-insured bank with respect to an application, advance, commitment, or loan. United States v. Thorn, 17 F.3d 325, 327 (11th Cir. 1994) (citation and internal quotations omitted). Contrary to Grant's contention, we have never required that the bank be actually aware of the false statement that was made. In fact, in United States v. Lentz, our predecessor circuit rejected the suggestion that the government was obligated to show that the false statements were "direct[ly] present[ed]" to the bank; it was enough, we held, to show that the defendant had "a reasonable expectation that the statement would reach [the

7

bank]." 524 F.2d 69, 70-71 (5th Cir. 1975). Nor have our cases required a showing that the bank actually be deceived by the false statements when they are made. United States v. Johnson, 585 F.2d 119, 125 (5th Cir. 1978). Rather, we have made clear that the focus under 18 U.S.C. § 1014 is "on the defendant's intent rather than the victim." Id. at 124. We focus on the defendant's conduct--not whether the bank was aware or unaware of that conduct.

In Grant's case, it is undisputed that the reports that were submitted to the bank were false.[6] Nor does Grant actually dispute that the false statements were intended to influence the bank.[7] Rather, his appeal hinges on an additional "bank awareness" requirement to 18 U.S.C. § 1014, one for which our case law provides no precedent. There was ample evidence presented[8] from which a jury could

---

[6] See Appellant's Br. at 7 ("There is no question that the statements given [to Covenant Bank] on the six occasions are false statements.").

[7] In arguing that his conduct was theoretically akin to hiding false reports in a bank desk drawer, Grant rather tellingly states that "[h]e made the false statement and he intended to use it to influence the bank but it is in the drawer and the bank doesn't know." Appellant's Br. at 12 (emphasis added). His appeal does not dispute that he intended to influence the bank; rather, he argues that the bank was not actually influenced because it remained unaware of his falsehoods.

[8] Although Grant testified that he was largely unaware of the false statements that were emanating from his company, there was a significant amount of evidence from which the jury could have concluded otherwise. The evidence at trial included the testimony of Hayes Parnell, the president of Covenant Bank, who testified that false statements were submitted to the bank during the time Southern Pride was seeking a credit line increase, and that when Parnell confronted Grant about it he did not deny that the statements were false. The government also presented the damaging testimony of comptroller Crisp, who testified that Grant instructed him to show accounts receivables of approximately $1 million, that Grant reviewed each of the false statements before they were submitted to the bank, and that Grant assured Crisp not to worry about the fact that the numbers were plainly false. Further testimony included that of Edwin

8

conclude, beyond a reasonable doubt, that Grant (1) made a false statement and that (2) he did so with the purpose of influencing Covenant Bank's conduct on the line of credit. Accordingly, Grant's motion for acquittal was properly denied.

## 2. Jury Instructions

Grant argues on appeal that the district court's special jury instruction was erroneous and confusing, and that it prejudiced his trial. Prior to having the jury retire for its deliberations, the judge instructed the jury that, in order to find Grant guilty, it needed to find, beyond a reasonable doubt: (1) "that the defendant knowingly made a false statement or report to the financial institution"; (2) "that the deposits of that institution were insured by the [FDIC]"; and (3) "that the defendant made the false statement or report willfully and with the intent to influence the action of the institution." R5 at 311-12. The judge also advised the jury that reliance on the part of the bank was not an element of the crime; the court explained that the jury was not obligated to find "that the institution . . . was in fact influenced or misled" by Grant's conduct. Id. at 312.

---

Markham, a project manager with Southern Pride, who testified that the statements were prepared with numbers obtained directly from Grant, and Shannon Roberts, an office manager at Southern Pride, who testified that Grant reviewed the false reports, instructed her to fax them to the bank, and assured her that, once the company procured the Anniston contract, the false statements would no longer be necessary. Taken as a whole, there was ample evidence from which "a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994) (citations omitted).

9

Subsequent to this instruction, however, the court drew the jury's attention to a special question at the end of the jury form, which stated: "[i]f your verdicts as to any one or more counts is or are guilty, what amount of loss did you find, beyond a reasonable doubt, that the Covenant Bank suffered as a result of the offenses charged." R5 at 320 (emphasis added). Although the amount of the bank's monetary loss was not an element of the crime charged, this question was apparently submitted because of uncertainty as to what individual facts the jury needed to find beyond a reasonable doubt in the wake of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).[9] The judge reminded the jury that this additional question as to loss was to be asked only "if [it] found [Grant] guilty of any one or more counts." R5 at 320.

Grant argues that this instruction was confusing to the jury and that it prejudiced him "by directing the jury to consider a matter not an element of the crime charged in reaching its decision about the guilt or innocence of [Grant]."

_____

[9] In Blakely, the Supreme Court concluded that a sentencing judge erred in enhancing the defendant's sentence by 37 additional months due to the judge's conclusion that the defendant had acted with "deliberate cruelty," when that fact was neither admitted by the defendant nor found by the jury beyond a reasonable doubt. 542 U.S. at 303, 124 S. Ct. at 2537. Because the Blakely decision suggested that certain facts needed to be found by a jury in order to later be used in sentencing, in Grant's case the district court asked the jury to determine, beyond a reasonable doubt, the total amount of monetary loss the bank suffered, despite the fact that this was not an element of the crime. This extra question was, if anything, borne of an over-abundance of caution on the part of the district court, due its concerns as to the implications of Blakely.

10

Appellant's Br. at 14. Grant did not object to the jury instructions at trial, raising this issue for the first time on appeal. Although ordinarily a challenge to a jury instruction is reviewed *de novo*, because Grant failed to object to the instruction at trial, we review for plain error only. LeCroy, 411 F.3d at 930. Under plain error review, we may correct an error where (1) an error occurred; (2) the error was plain; (3) the error affects substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Id.; see also United States v. Olano, 507 U.S. 725, 732-36, 113 S. Ct. 1770, 1777-79 (1993).

Over and above the deference we typically afford the district court under plain error review, we have stated that judges are given great discretion with respect to the submission of jury instructions, and that jury instructions are not to be "dissected on appeal." United States v. Brown, 43 F.3d 618, 623, 627 (11th Cir. 1995). Rather, we look at the entirety of the jury instruction, examining whether, viewed as a whole, it had a tendency to mislead the jury. Id. at 627. Grant argues that the judge's additional request–asking that the jury assess the amount of loss to Covenant Bank–was tantamount to adding an extra element to the crime charged, and that it was unduly prejudicial to his trial. We disagree.

First, at the outset of his instructions, the judge carefully instructed the jury as to the requisite elements of the offense. Those instructions constituted an

11

accurate statement of the law. It was only after the judge had recited the elements necessary to convict that he asked the jury to render a special finding on the amount of loss. Despite this extra question, however, the judge made clear that the question of loss was an additional question on the verdict form–i.e., that it was not a part of the crime–and that the question was contingent upon the jury first finding guilt beyond a reasonable doubt for the crime charged. As the judge explained it, the jury was only to inquire into monetary loss "[i]f [its] verdicts as to any one or more counts" was guilty. R5 at 320. See also id. ("So you would find that amount if you found him guilty of any one or more counts.") (emphasis added). The contingent phrasing of the question made clear that it was a question to be asked separate from the question of Grant's guilt or innocence.

Nor does Grant explain how the special verdict question could have affected the outcome of his case, other than his generalized contention that it caused him "prejudice[]." Appellee's Br. at 14. Simply put, we fail to see how this aspect of the jury instruction substantially affected Grant's rights. See LeCroy, 441 F.3d at 930-31 (upholding a jury instruction that permitted the jury to ask whether the defendant was a threat to the public "if the jury first found, beyond a reasonable doubt," that the defendant posed an escape risk, and finding that defendant failed to "demonstrate that there [was] a reasonable possibility of a different outcome"

12

without the jury instruction) (emphasis added). Given the careful nature of the judge's instructions, as well as the court's well-founded concerns, at the time, over the potential implications of Blakely on fact-finding for sentencing purposes, we cannot say that the instructions constituted error, plain or otherwise.

B. Government's Cross Appeal of Grant's Sentence

The government cross-appeals Grant's sentence, arguing that the district court judge committed errors in sentencing Grant. The government's argument on appeal is two-fold. First, the government asserts that the district court's calculation of the amount of loss for sentencing purposes was clearly erroneous. Second, the government contends that the sentence that the court imposed on Grant was improper because it was below the range recommended by the Sentencing Guidelines, and the court failed to state adequate reasons supporting that sentence. Because we agree with the government's first contention, we need not reach the second issue.

1. Calculation of Loss

The district court's calculation of the amount of loss for sentencing purposes is a factual determination reviewable for clear error. United States v. Delgado, 321 F.3d 1338, 1348 (11th Cir. 2003); United States v. Maung, 267 F.3d 1113, 1118 (11th Cir. 2001). We have indicated that clear error will be present when "we are

left with a definite and firm conviction that a mistake has been committed" by the district court.  United States v. Crawford, 407 F.3d 1174, 1177 (11th Cir. 2005) (citation omitted).

Under U.S.S.G. § 2B1.1, the base offense level for a theft offense involving fraud or deceit is six.  In addition, the Guidelines state that a defendant's offense level is subject to enhancement if the monetary loss in the case exceeded $5,000.  U.S.S.G. § 2B1.1(b)(1).  The extent of the sentence enhancement is determined by the total amount of the loss.  Id.  A loss of more than $400,000, for example, leads to a fourteen-level enhancement.  See U.S.S.G. § 2B1.1(b)(1)(H).

In Grant's case, the probation officer prepared a Presentence Investigation Report ("PSI") prior to the Sentencing Hearing.  The PSI calculated Grant's base offense level as six, pursuant to U.S.S.G. § 2B1.1(a).  The PSI calculated the total loss to the bank as $481,945.38.  Thus the PSI recommended a fourteen-level enhancement to Grant's sentence, since the offense involved a loss of more than $400,000 but less than $1,000,000.  See U.S.S.G. § 2B1.1(b)(1)(H).  The PSI also recommended another two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.  This resulted in a total offense level of 22.  With an offense level of 22 and a criminal history category of I, Grant was subject to a Guidelines

14

range of 41 to 51 months of imprisonment.[10]

At the sentencing hearing, the district court judge expressed concern over the proper calculation of the loss amount for purposes of U.S.S.G. §2B1.1.  The court made clear that it was unconvinced that the total loss was $481,945.38, the figure indicated in the PSI.  Specifically, the court observed that Southern Pride's line of credit was close to fully exhausted–with a balance of around $496,000–even before the company started falsifying its accounts receivable in September 2002.  In light of that fact, the court expressed skepticism that Grant's conduct caused a loss of over $400,000, as the PSI alleged.  The court asked the government to establish with more certainty the sum of money that Grant obtained and failed to pay back as a result of his false statements to the bank.  R9 at 4.  As the court indicated, if Grant "already owed the money [] before he ever gave that [false] information, [then] giving that information didn't cause the loss."  Id.

In response, the government offered the testimony of Hayes Parnell, the president of Covenant Bank.  Parnell testified that the total outstanding balance on the account at the time Southern Pride ceased its operations in 2003 was approximately $496,000, and that, after recovering a single backhoe worth $12,000, the total loss that the bank wound up suffering was approximately

_____

[10] The 2003 edition of the Sentencing Guidelines was used in calculating Grant's sentence.

15

$484,000.  When pressed by the court as to whether that loss was <u>caused</u> by Grant's false statements in 2002 (as opposed to being simply a prior outstanding balance), Parnell testified that if the bank not been deceived by Grant throughout 2002-2003, it could have taken steps, prior to Southern Pride's closing, to protect its security interest.  Parnell pointed out that the bank had a contractual right, in the event of a default, to offset the outstanding balance on line of credit with Southern Pride's deposits, and that it would have sought to do so had it known of Southern Pride's repeated false submissions.  Parnell also testified that the bank "could have done what we could to get the note paid down to where it was within the amount of the collateral; or we would have called the whole loan, if we had been suspicious enough to think that something really bad was happening."  R9 at 10-11.  The government maintained that, since the bank might have collected some of the lost funds from Southern Pride's accounts receivables had it known of Grant's false statements sooner–and, at least in that sense, Grant's fraudulent conduct "caused" the bank's loss–the loss amount should be the sum that the bank had failed to recover, i.e. $484,000.

The district court, however, remained unpersuaded by this argument.  The court informed the government that it could not find, by a preponderance of the evidence, that the total loss was $484,000.  When the court asked Grant's counsel

16

for his suggested loss amount for purposes of § 2B1.1, he indicated that the loss should be approximately $20,000.[11]  The court rejected both figures, stating: "I'm going to find, and I know this may sound arbitrary . . . . I'm going to find that the loss is $50,000."  R9 at 18.  This determination resulted in a six-level enhancement in Grant's sentence, see U.S.S.G. § 2B1.1(b)(1)(D), rather than the fourteen-level enhancement that the government had sought.  Consequently, Grant's sentencing range went from a recommended 41 to 51 months of prison (Offense Level 22) to a 15 to 21 month sentencing range (Offense Level 14).

In cases involving financial fraud, such as Grant's, the district court is required to calculate properly the amount of loss pursuant to U.S.S.G. § 2B1.1. See United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006).  Indeed, the commentary to U.S.S.G. § 2B1.1 states that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline." U.S.S.G. § 2B1.1 cmt. backg'd (emphasis added).  While the district court retains broad discretion in determining the loss amount, Hamaker at 1338, the court nevertheless is obligated

---

[11] Grant's attorney arrived at this figure by arguing that the balance in October 2002 had been drawn down to $464,000, and that the line increased between that period and Southern Pride's demise in 2003 to $484,000–a difference of $20,000.  Although Grant's counsel stated at the hearing that the difference between $464,000 and $484,000 was "$10,000," R9 at 17, we assume that he intended to state $20,000 as the loss proposed figure.

to "make independent findings establishing the factual basis for its guidelines calculation." Id. "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004).

In this case, the district court first concluded that government had failed to show a loss of $484,000 by the preponderance of the evidence. In the wake of that determination, the court proceeded to reject both the government's recommended loss amount ($484,000) and the defendant's recommended loss amount ($20,000), as well as the loss that had been found, beyond a reasonable doubt, by the jury at trial ($350,000). Rather than adopting any of these figures, the court settled, somewhat inexplicably, on a total loss amount of $50,000. Not only was the record devoid of any such basis for arriving at that figure as the loss, but the court failed to state any "findings establishing the factual basis for its Guidelines calculation." Hamaker at 1338. Moreover, in a burst of candor, the court stated its recognition that the $50,000 figure "may sound arbitrary." R9 at 18. In similar cases involving unexplained loss calculations by the sentencing judge, we have seen fit to vacate the sentence and remand the case for re-sentencing. See, e.g., United States v. Liss, 265 F.3d 1220, 1231 (11th Cir. 2001) (vacating a district

18

court's sentence and remanding for re-sentencing, since the court "fail[ed] to make sufficient factual findings regarding the amount of loss" under the Guidelines). We do so here.

The case of United States v. Renick, 273 F.3d 1009 (11th Cir. 2001) (per curiam), is strikingly on point with the facts of Grant's case. In Renick, which involved Medicare fraud, the sentencing judge noted difficulties in calculating the total amount of loss, due to factual gaps in the record. After rejecting the government's recommended loss amount, the court stated: "in the absence of anything more concrete, I'm just gonna arbitrarily pick a number and say it's between 70,000 and a hundred twenty thousand and we will proceed." 273 F.3d at 1024. On appeal, we held that this estimate of the loss was arbitrary, "an abuse of discretion and contrary to law." Id. at 1027. We stated that there was "no basis for making a reasonable estimate as to [the] loss," and that, apparently, "the district court felt some duty to find some loss, arbitrary or otherwise, but . . . stated no findings upon which its 'estimate' was made." Id. Accordingly, we vacated the sentence imposed and remanded the case for re-sentencing. Id. at 1028.

Here, as in Renick, the district court failed to provide any factual basis whatsoever for its ultimate loss calculation of $50,000. Thus, the district court clearly erred in calculating the amount of loss attributable to Grant's false

19

statements. And because the amount of loss is an essential component in the calculation of a defendant's sentence under U.S.S.G. § 2B1.1, the court erred in calculating Grant's sentence under the Guidelines. We conclude that Grant's sentence should be vacated, and that his case should be remanded to the district court for re-sentencing.

2. Sentence Imposed

The government also argues that the district court erred in sentencing Grant below the recommended Guidelines range without stating its reasons in support of that decision. The court sentenced Grant to ten months–five months of imprisonment followed by five months of home custody–when the recommended range (for an Offense Level 14) was 15 to 21 months.[12] Because we have already concluded that the district court's calculation of the sentencing range was based on an improper calculation of the total loss amount, however, we need not address the

---

[12] As an aside, we note that the district court judge imposed Grant's sentence under the apparent misapprehension that he was sentencing Grant within the recommended Guidelines range. The judge stated "I see no grounds for departure" and then proceeded to sentence outside of the Guidelines range. R9 at 37. Over and above the court's erroneous calculation of Grant's sentence as discussed in the previous section, this fact alone would be sufficient grounds to vacate Grant's sentence and remand his case, since we have made clear that the court's duty to properly "consult" the guidelines cannot be based on an erroneous understanding of them. See Crawford, 407 F.3d at 1183 ("[B]ecause true consultation cannot be based on an erroneous understanding of the Guidelines, the district court erred in failing to consult properly the Guidelines."); id. at 1179 ("A misinterpretation of the Guidelines by a district court effectively means that the district court has not properly consulted the Guidelines."(citation and alteration omitted)).

government's separate argument concerning the district court's failure to state its reasons for a downward departure. The recommended range itself was based on a faulty calculation of the loss amount; that fact, standing alone, militates in favor of a remand, irrespective of the court's decision to sentence outside of that range.

## III. CONCLUSION

Grant has appealed his convictions for violating 18 U.S.C. § 1014, challenging both the sufficiency of the evidence and the district court's instructions to the jury prior to its deliberations. The government has cross-appealed, contending that the district court committed errors in the manner in which it calculated and imposed Grant's sentence. Upon careful review of the record, we discern no error pertaining to Grant's convictions. However, we agree that the district court committed errors in calculating Grant's sentence. Accordingly, we **AFFIRM** Grant's convictions, **VACATE** Grant's sentence, and **REMAND** this case for re-sentencing.